FILED  1st JUDICIAL DISTRICT COURT
Rio Arriba County
5/14/2025 4:57 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jacqueline Rosales Juarez

**STATE OF NEW MEXICO**
**COUNTY OF RIO ARRIBA**
**FIRST JUDICIAL DISTRICT COURT**

**A.R.,**

        **Plaintiff,**

**vs.**
        **No.** D-117-CV-2025-00202

Case assigned to Biedscheid, Bryan

**ACADIA HEALTHCARE COMPANY, INC.,**
**ACADIA MANAGEMENT COMPANY, LLC,**
**YOUTH AND FAMILY CENTERED**
**SERVICES OF NEW MEXICO, INC. d/b/a**
**DESERT HILLS, and ANGELICA LYNN,**

        **Defendants.**

## COMPLAINT FOR PERSONAL INJURIES

COMES NOW, Plaintiff A.R., by and through her attorneys, Fadduol, Cluff, Hardy & Conaway, P.C. (Carlos E. Sedillo, Meghan L. Mitchell, and Isaac J. Lopez), and for her Complaint for Personal Injuries, against Defendants STATES:

### I. PARTIES, JURISDICTION, AND VENUE

1.    A.R. is a resident of Delaware.

2.    Upon information and belief, Defendant Acadia Healthcare Company, Inc. ("**Acadia**") is a foreign registered corporation with a registered agent located at CT Corporation System, 206 S. Coronado Avenue, Española, New Mexico 87532.

3.    Upon information and belief, Defendant Acadia Management Company, LLC ("**Acadia Management**") was formerly a foreign unregistered corporation with its principal place of business at 600 Tower Circle, Suite 1000, Franklin, Tennessee 3067-1509, with a registered agent, CT Corporation System, located at 300 Montvue Road, Knoxville, Tennessee 37919-5546.

4.    Upon information and belief, Defendant Youth and Family Centered Services of New Mexico, Inc. ("YFCS") is a domestic for-profit corporation with its principal place of business in

**EXHIBIT A**

Albuquerque, Bernalillo County, State of New Mexico, with a registered agent located at CT Corporation System 206 S. Coronado Ave., Espanola, New Mexico 87532.

5.  Upon information and belief, YFCS is a wholly-owned subsidiary of Acadia.

6.  Upon information and belief, YFCS operated a licensed New Mexico residential treatment center, Desert Hills, which purported to serve children with a range of mental, emotional, addiction, and behavioral issues.[1]

7.  Upon information and belief, Defendant Angelica Lynn resides in Washington State. At all times material hereto, Defendant Lynn was an employee and/or agent of Acadia and Desert Hills.

8.  Jurisdiction and venue are proper in this Court.

## II. GENERAL FACTS COMMON TO ALL CLAIMS

9.  The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

**Background of Addiction and Mental Health in the United States**

10.  In 2008, the United States Congress passed the Mental Health Parity and Addiction Equity Act ("Act"). The Act required health plans and insurers to pay for addiction and mental illness treatment just as they would for cancer or cardiovascular disease.

11.  Two (2) years later, Congress passed the Patient Protection and Affordable Care Act ("ACA"), commonly referred to as "Obamacare".

12.  These two (2) laws created a shift of behavioral health funding from State budgets to insurance.

---

[1] Youth and Family Centered Services of New Mexico d/b/a Desert Hills has closed but still has an "Active" business license according to the New Mexico Secretary of State Corporations Division.

13. With the ACA in place – and its requirement for coverage of mental health and drug abuse – the swelling numbers of insured persons combined with the opioid epidemic sweeping the nation, kicked off a mental health gold rush.

14. Mental health investments quintupled, with Americans' addiction to drugs spelling opportunity for private equity firms.

**General Information About Defendant Acadia Healthcare Company, Inc.**

15. Acadia was established in 2005 to develop and operate a network of behavioral health facilities across the country. It provides psychiatric and chemical dependency services.

16. Acadia currently operates a network of 258 behavioral health facilities, with approximately 11,400 beds in 38 states and Puerto Rico.

17. Not long ago, and during all times material hereto, Acadia operated a network of 586 behavioral health facilities, with approximately 18,000 beds in 40 states, the United Kingdom, and Puerto Rico.

18. In 2012, Acadia's revenue was $413 million. That number swelled to $1.038 billion in 2014. In 2018, Acadia reported revenue of $2.268 billion through September. In 2023, Acadia's revenue continued to grow and reported revenue at $2.92 billion. Acadia's latest financial report projected another revenue growth, projecting revenue to be $3.150 to $3.165 billion for 2024.

19. As of February 18, 2025, Acadia had a market cap of $3.84 billion.

**Background of Joey Jacobs**

20. At all times relevant here, Joey Jacobs was the Chairman and CEO of Acadia and oversaw the growth of Acadia following the enactment of the Affordable Care Act. Jacobs had been the head of Acadia since 2011.

21. In 1997, Jacobs co-founded Psychiatric Solutions, Inc. ("PSI") and served as its President and CEO from 1997 until 2010. Before founding PSI, he served for 21 years in various capacities with Hospital Corporation of America ("HCA").

3

22.     Jacobs initiated a plan whereby PSI would fill up as many beds as possible with as little staff as possible, causing profits to soar.[2]

23.     Former PSI employees have characterized the culture as: " 'It's a pattern of behavior driven totally by the almighty dollar,' said Chad Thompson (who worked at an admissions office at Sierra Vista when PSI took over) . . . 'It's not a client-centered approach. It's a money-centered approach.' "[3]

24.     In September of 2009, shareholders of PSI filed a derivative lawsuit against PSI for failing to disclose adverse facts about the company and for false promises regarding the success of the company, which artificially inflated the supposed values of the company shares. The shareholders also alleged that PSI had "suffered from systemic quality of care and patient safety problems" for years.[4]

25.     "The complaint allege[d] that PSI failed to sufficiently staff its facilities, resulting in alarming incidents of abuse, neglect, and even the death of its patients, and downplayed the significance of these events when they became public."[5]

26.     Jacobs showed up several times within the lawsuit, always with empty promises:

- ". . . we constantly are improving the safety, looking at ways to improve the safety, quality, meeting standards and regulations."

- ". . . compliance for us starts at the single employee taking care of that single patient. And it's the responsibility of the CEO at that facility to make sure they are in compliance and great quality there."

---

[2] *See* Christina Jewett & Robin Fields, "Psychiatric Care's Peril and Profits" (dated November 22, 2008), *available at*: https://www.propublica.org/article/psychiatric-cares-perits-and-profits-psychiatric-solutions-inc.
[3] *Id.*
[4] Complaint for Violation of Federal Securities Laws, *Garden City Employees' Retirement Sys. v. Psychiatric Solutions, Inc.*, *Joey Jacobs, et al.*, in United States District Court Middle District of Tenn., Nashville Division (dated September 21, 2009).
[5] "Shareholders Obtain $65 Million Settlement in Psychiatric Solutions" (dated January 17, 2015), *available at*: https://www.rgrdlaw.com/news-item-65-million-psychiatrict-solutions.html.

- "... if we internally classify it as a grave incident ... we immediately begin a root-cause analysis to see if there is a way we can improve the facility and improve the process there... ."

- "Minimizing and eliminating these type of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously and we have built a very effective infrastructure over the past several years."[6]

27.     Jacobs seemingly ignored these issues and would refer to incidents at PSI facilities as "creat[ing] noise for us."[7]

28.     Jacobs was responsible for shaping this corporate culture of putting profits first, and under his control, PSI went from a revenue of $114 million in 2002 to $1.8 billion in 2009.

29.     PSI's lack of quality care and poor corporate culture was documented in a report prepared by the University of Illinois at Chicago's for the DCFS:

> There is compelling data about the tendency of this organization's leadership to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures – in effect, placing the onus for the chronic quality of care problems downward: first onto the hospital staff 'who do not perform their duties'; [and] second, onto mentally ill patients who 'refuse to comply with the rules,' . . . .
>
> Such resistance to critical self-examination, and the organizational tendency to 'blame downward' and/or 'outward' when quality of care problems arise, is by no means limited to Riveredge officials. In fact, the earlier brief review of similar problems in PSI facilities around the United States shows a corporate culture operating from one crisis to the next – always primed to immediately spring into action to fix problems that were otherwise ignored until yet another crisis eventually forces attention to be paid.[8]

30.     Jacobs left PSI in November 2010.

---

[6] Complaint for Violations of Federal Securities Laws, at 17-18, *Garden City Employees' Retirement Sys. V. Psychiatric Solutions, Inc., Joey Jacobs, et al.*, in United States District Court Middle District of Tenn., Nashville Division (dated September 21, 2009).

[7] *Id.*

[8] CCHR Internat'l, "Psychiatric Chain Under Investigation for Billing Fraud & Abuse in U.S. Now Buys U.S. Behavioral Facilities'", at 5 (dated January 16, 2017), *available at*: http://www.cchrvictoria.org.au/psychiatrict-chain-under-investigation-for-billing-fraud-abuses.

**Jacobs Takes Over at Acadia**

31.    In February of 2011, Jacobs took over at Acadia as the Chairman of the Acadia board and CEO. He served in this capacity until December 17, 2018, when he was removed.

32.    All but one of his corporate officers of Acadia were previous owners and/or officers of PSI, therefore, ensuring that the culture initiated by Jacobs at PSI continued on at Acadia.[9]

33.    When Jacobs took over Acadia in 2011, Acadia had about six (6) facilities.

34.    With private equity money flooding mental health and addiction services, Jacobs capitalized on the steady stream of income available.

**Acadia Acquires Youth and Family Centered Services of New Mexico, Inc.**

35.    YFCS operated a treatment facility for children with a wide range of intellectual and developmental disabilities, as well as behavioral issues, called Desert Hills.

36.    Desert Hills claimed it "specialize[d] in offering fully comprehensive residential programming that encompasses a full continuum of care."

37.    The website represented that Desert Hills' residential treatment program "consists of 24-hour nursing and an intensive therapeutic and educational program."

38.    The website represented that Desert Hills ". . . guarantee[s] that every child or adolescent at Desert Hills will receive the most appropriate care that truly meets his or her unique needs and builds upon every existing strength."

39.    The website represented that: "If your child is battling behavioral, emotional, or cognitive concerns, and you want him or her to receive care that will set the stage for lasting and successful treatment outcomes, look no further than Desert Hills."

40.    Upon information and belief, Acadia acquired YFCS and Desert Hills in 2016.

---

[9] *Id.*

41.     Upon information and belief, Acadia controlled the budget of Desert Hills, set benchmarks for profitability, and profitability determined the bonus the CEO would receive each year.

42.     Additionally, upon information and belief, CEOs and other management of Acadia facilities, such as Desert Hills, were employees of Acadia, not Desert Hills.

43.     Upon information and belief, when incidents occurred at Desert Hills, staff were required to call Risk Management at Acadia to report such incidents. Acadia determined what level of severity was assigned to such incidents, which controlled whether those incidents triggered mandatory reporting requirements to institutions such as the State of New Mexico or the Joint Commission.

44.     Desert Hills management was trained at Acadia, by Acadia personnel and Acadia's liability insurers in topics such as incident investigation and client management.

45.     Acadia healthcare management attended quarterly Governing Board meetings with Desert Hills to discuss its finances and whether the facility was meeting its budget.

46.     Acadia controlled every aspect of Desert Hills operations.

47.     In 2018, the New Mexico Children, Youth and Families Department ("**CYFD**") issued Desert Hills a cease-and-desist letter order, as CYFD reported that clients of Desert Hills were not safe in the facility, citing incidents of staff assaulting and abusing children.[10]

48.     The CYFD cease-and-desist letter, in part, ordered Desert Hills to close its facility within 90 days.

49.     In 2019, Desert Hills closed its doors.

50.     The abuse and neglect that occurred at Desert Hills is and was the subject of litigation brought by many victims of Desert Hills.

---

[10] Shellye Leggett, "Desert Hills employees out of a job sooner than expected," (dated February 26, 2019), *available at https://www.koat.com/article/desert-hills-employees-out-of-a-job-sooner-than-expected/26544346.*

**Acadia Management Company, LLC**

51.     Acadia Management is used as a shell corporation by Acadia in an attempt to shield Acadia from liability arising from Acadia's systemic corporate misconduct resulting in severe injuries to children.

52.     Acadia Management is the ostensible employer of Acadia employees, including the former CEO and CFO of Desert Hills and Desert Hills employees.

53.     Acadia has no employees and only operates through Acadia Management.

54.     It appears that the only purpose of Acadia Management is to attempt to inject another layer of separation between Acadia and its employees and agents perpetrating harms against children through systemic corporate misconduct.

55.     Acadia Management is nothing more than an empty shell and should be disregarded as such.

**General Background of A.R.'s Incidents**

56.     The allegations of the preceding and succeeding paragraphs are incorporated herein by reference.

57.     Upon information and belief, Desert Hills was a treatment facility, long-term rehab, and therapeutic boarding school for children and adolescents.

58.     Desert Hills and Acadia were responsible for hiring, training, and supervising its employees and/or agents working at Desert Hills.

59.     On or around August 2018, A.R. was transferred from out-of-state to Desert Hills after being removed from his family home in Delaware.

60.     At the time of his admission to Desert Hills, A.R. was 14 years old and was a vulnerable child in need of protection.

61.     Once A.R. was admitted to Desert Hills, he was placed in the Evergreen Unit. The Evergreen Unit at Desert Hills was the largest unit at Desert Hills and was an aggression and suicidal ideation unit.

62.     Almost immediately, within the first 3 to 4 days after arriving at Desert Hills, A.R. began to be sexually abused and groomed at Desert Hills by Defendant Lynn.

63.     Defendant Lynn was an employee and/or agent of Desert Hills and Acadia and was a behavioral health technician at Desert Hills, who worked in the Evergreen Unit.

64.     Defendant Lynn first began taking A.R. to a secluded space in the Evergreen Unit, known as the "quiet/sensory room."

65.     In the quiet/sensory room, Defendant Lynn would tell A.R. that she would help A.R. get out of Desert Hills if A.R. did everything she asked. Everything Defendant Lynn asked from A.R. was illegal and sexually abusive.

66.     Defendant Lynn would often force A.R. to kiss her.

67.     Defendant Lynn would also digitally penetrate A.R. and perform oral sex on A.R.

68.     Defendant Lynn also forcefully performed oral sex on A.R.

69.     Defendant Lynn would sexually abuse A.R. nearly every time she was on shift, often more than once a day.

70.     Defendant Lynn was also assigned as A.R.'s 1 to 1 staff member, which allowed Lynn to sexually abuse A.R.

71.     Defendant Lynn would also discuss getting sex toys, such as a strap-on, so A.R. could use it on Lynn.

72.     When Defendant Lynn started working the overnight shift at Desert Hills, she began to go into A.R.'s room at nighttime to abuse A.R. in his room as well.

73.     Defendant Lynn also groomed A.R. by letting A.R. use Lynn's cell phone.

74.     Defendant Lynn also discussed dating A.R. and told A.R. that if they dated, A.R. could use Lynn's cell phone.

75.     When A.R. refused Defendant Lynn's advancements, however, Lynn abused her power over A.R. and told A.R. that she would interfere with A.R.'s release from Desert Hills if A.R. did not do what Lynn wanted.

76.     Fearful of A.R. reporting the sexual abuse, Defendant Lynn would abuse her power over A.R. and would sit with A.R. and listen to A.R.'s telephone conversations to prevent and ensure A.R. did not disclose the abuse.

77.     When A.R.'s mother tried to have A.R. released from Desert Hills, Desert Hills refused to do so.

78.     Eventually, A.R. was released from Desert Hills in or around December 2018.

79.     Upon information and belief, Defendant Lynn was investigated and eventually terminated for sexually abusing another child at Desert Hills.

80.     A.R. sustained serious injuries during his time at Desert Hills.

### III. COUNT I
### Corporate Veil Piercing
### (YFCS and Acadia)

81.     The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

**Desert Hills is the alter ego of Acadia**

82.     The corporate compliance statement on the Desert Hills' website listed an Acadia compliance officer as its compliance contact.

83.     The corporate officers and corporate address, listed on the corporate registrations for both Acadia and Desert Hills with the New Mexico Secretary of State, are the same.

84.     The Directors of both Desert Hills and Acadia were listed as Joey A. Jacobs and Christopher L. Howard.

85.     The President of both Desert Hills and Acadia was listed as Joey A. Jacobs, former CEO of Acadia. The current corporate registration for Desert Hills lists Christopher Hunter as the current CEO of Acadia.

86.     The Secretary of both Desert Hills and Acadia is listed as Christopher L. Howard.

87.     The Vice President of Desert Hills and Executive Vice President of Acadia is Brian F. Farley.

88.     Upon information and belief, the listed address for both Desert Hills and Acadia is 6100 Tower Circle, Suite 1000, Franklin, Tennessee, 37067, which is Acadia's corporate headquarters.

89.     Upon information and belief:

a.     Acadia owns all, or the majority, of the capital stock in Desert Hills;

b.     Acadia and Desert Hills corporations have common directors or officers;

c.     Acadia finances Desert Hills and its budget;

d.     Acadia subscribes to all the capital stock of Desert Hills and/ or otherwise caused its incorporation;

e.     Desert Hills has grossly inadequate capital;

f.     Acadia paid the salaries and expenses and losses of Desert Hills, including issuing pay checks to all Desert Hills employees;

g.     In the papers of Acadia, and its statement of Acadia officers, Desert Hills is referred to as a subsidiary, department, or division of Acadia.

h.     The directors and executives of Desert Hills do not act independently in the interest of Desert Hills but instead, not only take direction from Acadia, but are, in the case of Desert Hills' CEO and COO, actual Acadia employees;

i.     The formal legal requirements of Desert Hills as a separate and independent corporation are not observed;

j.     All of Desert Hills' revenue goes to Acadia;

k.  All capital expenditures are approved by Acadia;

l.  Acadia negotiates employment contracts between Desert Hills and hired employees.

m.  Upon information and belief, the CEO and COO of Desert Hills are Acadia employees.

n.  Upon information and belief, the paychecks of all employees at Desert Hills are paid by Acadia.

90.  The CEO and CEO of Desert Hills are Acadia employees.

91.  The employees of Desert Hills are paid by Acadia.

**The corporate veil should be pierced between Acadia and Desert Hills**

92.  Acadia disregarded the interests of Desert Hills in favor of Acadia's own interests, showing both substantive control and improper purpose.

93.  Acadia absolutely controlled Desert Hills for Acadia's own personal benefits as opposed to its benefits as a shareholder of Desert Hills, including the intentional and strategic destruction of the computer servers of Desert Hills, and destruction of hundreds of thousands of pages known as the "Nube Documents" approximately ten (10) days after a *United Nuclear* default judgment sanction was imposed in other litigation against Acadia.

94.  All Desert Hills employees were subject to Acadia control.

95.  For example, the personnel files of Desert Hills make it clear that employees worked for Acadia and were subject to Acadia control through Acadia's policies and procedures.

96.  Failing to pierce the corporate veil would result in extreme injustice to Plaintiff.

97.  New Mexico law is clear that the "the corporate entity will be disregarded by the courts when the corporation is used to perpetrate fraud or promote injustice." *Scott Graphics, Inc. v. Mahaney*, 1976-NMCA-038, ¶¶ 16-17, 89 N.M. 208.

98.     Acadia improperly and intentionally limited the discretion and judgment of its subsidiaries and the employees of its subsidiaries and completely dominated not only finances but also policies and business practices.

99.     Acadia could have restated Desert Hills' Bylaws so that the Board of Directors did not have to meet, but never did so.

100.    In fact, after Acadia acquired Desert Hills, the policies and procedures for Desert Hills were changed and the policy regarding Desert Hills' governing body stated: "The Governing Body shall follow the guidelines set forth by Acadia Healthcare" and mandated "[t]he Governing Body will meet quarterly and include the Regional Clinical Director and representatives from the Acadia Corporate Office."

101.    The Governing Body was not its board of directors and had no formal relationship with the board of directors, nor were management functions delegated by the board to the Governing Body.

102.    Desert Hills' Risk Management Program Plan was aimed at blaming the children at the Residential Treatment Center ("RTC") and protecting Acadia's assets at the expense of children's safety, which is an immoral and improper purpose.

103.    Acadia attempted to improperly influence former Governor Susanna Martinez to rein in CYFD, which is again an immoral and improper purpose, as Acadia attempted to limit CYFD's ability to regulate Desert Hills' dangerous activities, resulting in hurting children. The Consulting Contract for Acadia's lobbyist, Mickey D. Barnett, reflects the attempt to improperly influence the Governor and the New Mexico Legislature.

104.    The evidence also shows billing for services not given, employment of underqualified and unqualified people, downgrading incidents to avoid increasing costs, and failure to properly supervise employees.

105.    These decisions were taken for the financial benefit of Acadia at the expense of the safety of the clients of Desert Hills.

106.    Ultimately, Desert Hills was operated by Acadia for some purpose other than the safe and lawful care of Desert Hills' patients.

107.    The directors of Desert Hills were not managing Desert Hills, because the directors and managers of Desert Hills were employees of Acadia. Acadia controlled the policies, including employment, risk management, quality, IT, email destruction, etc., even though the care was supposed to take place at the local level at Desert Hills.

108.    Acadia's pledging of Desert Hills' assets to further Acadia's lines of credits/loans for Acadia's expansion agenda and enterprise is also an improper purpose, because it was done for the interests of Acadia, not Desert Hills.

109.    Acadia's systemic and intentional destruction of evidence, which, again, is not only improper, but also immoral, began with its promulgation of its mandatory email destruction policy that all subsidiaries, including Desert Hills were required to follow.

110.    Desert Hills had no involvement in the decision to ship Desert Hills' servers to Acadia's Tennessee headquarters.

111.    Former CEO Joey Jacobs could not have acted independently as an officer of Desert Hills. In deposition, he admitted he did not even know he was a Director for Desert Hills.

112.    Further, Keith Thompson, former Deputy General Counsel for Acadia, conceded Jacobs never did anything in his capacity as a Desert Hills' officer and, instead, everything Jacobs did was in his capacity as CEO of Acadia.

113.    Acadia's control of, and mismanagement of, Desert Hills, also resulted in the systemic and ongoing destruction of other evidence, including Desert Hills' server and Nube Documents.

114.    Charles Cahill, former Acadia IT employee who destroyed the Desert Hills' servers, admitted that the server was never stolen and was in fact located at the Desert Hills' campus until Acadia took possession of it and ordered it sent to Acadia corporate headquarters.

115.    Additionally, Acadia personnel specifically ordered the destruction of the Nube Documents.

116.    The Nube Documents contained a mixture of Desert Hills documents, not only demonstrating requisite domination of those entities, but also of an improper purpose.

117.    The predecessor company for Nube, Document Imaging of the Southwest, executed a Mutual Non-Disclosure Agreement with Acadia Healthcare.

118.    Thousands of pages of Nube Documents were destroyed.

119.    Veil piercing requires a showing that "recognition of the separate corporate existence of the two corporations would sanction fraud **or other** improper purposes." *Scott v. AZL Resources, Inc.*, 1988-NMSC-028, ¶ 7 (bolding added).

120.    Acadia destroyed evidence ostensibly in the possession of Desert Hills, even after it was placed on specific notice to preserve evidence and acknowledged its duties to preserve evidence in an email sent to Desert Hills by Dulce Mooney, former Chief Risk Officer.

121.    Acadia caused the destruction of the Nube Documents, which included Desert Hills documents.

122.    Acadia's abuse of the corporate form caused injury to Plaintiff.

123.    The corporate veil should be pierced between Acadia and Desert Hills.

124.    Lastly, Acadia Management is nothing more than an empty shell corporation that Acadia uses to attempt to shield itself from the consequences of its amoral corporate conduct and the empty shell nature of Acadia Management should be acknowledged.

## IV. COUNT II
### Negligence
### (YFCS and Acadia)

**Negligence**

125.    The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

126.    Defendants owed a duty to exercise ordinary care and act as a reasonable and prudent company would under the same or similar circumstances, including, but not limited to, ensuring the safety of A.R., a vulnerable minor child in need of protection. Defendants breached that duty and were negligent. Defendants' negligence was the sole proximate cause and/or a proximate cause of A.R.'s injuries. Defendants' negligence includes, but is not limited to, the following:

  a.  Failing to secure A.R. in a safe environment;

  b.  Failing to reasonably exercise custodial control over A.R.;

  c.  Failing to reasonably exercise *in loco parentis* powers over A.R.;

  d.  In negligently hiring, supervising, and/or retaining control of employees who manage, direct, and/or control operations on behalf of Defendants;

  e.  In failing to exercise their authority to control the manner in which work was performed to adequately train their employees and/or agents to keep safe custody of A.R.;

  f.  In failing to keep children safe while placed in facilities;

  g.  In failing to have appropriate policies and procedures, or, in the alternative, failing to enforce their policies and procedures; and

  h.  In other respects to be found during the course of discovery.

127.    Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

128.     A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

### *Respondeat Superior*

129.     Defendants are vicariously liable for the damages proximately caused to A.R. by virtue of the negligent conduct of their employees. At the time of the incidents underlying this matter, Defendants had employees who were acting within the course and scope of their employment with Defendants and were negligent. The negligence of these employees was a proximate cause of A.R.'s injuries and harm. Therefore, Defendants are vicariously liable to Plaintiff for the negligent acts and/or omissions for their employees on the basis of *respondeat superior*.

130.     Defendant Lynn was an employee and agent of Desert Hills and Acadia.

131.     Defendant Lynn was given, and exercised, significant authority and control over A.R., by virtue of her employment and agency as an employee with Desert Hills and Acadia.

132.     At all times, Defendant Lynn was aided by her agency with Desert Hills and Acadia in the commission of the harm perpetrated against A.R.

133.     Furthermore, Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient

discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

134.    Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

135.    Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

**Negligent Selection, Retention, and/or Supervision**

136.    Defendants are subject to liability for harm to persons, such as A.R., for Defendants' failure to exercise reasonable care to employ competent and careful employees and/or agents. Defendants breached their duty to select, retain, and/or supervise such employees and/or agents and were negligent in their selection of employees and/or agents to work at Defendants' facility – Desert Hills. Defendants' negligence was the sole proximate cause and/or a proximate cause of A.R.'s injuries and harm. Defendants' negligence includes, but is not limited to:

    a.  Failing to select employees and/or agents who could skillfully and carefully perform work involving risk of harm to juveniles;

    b.  Failing to select employees and/or agents who could properly perform any duty, which an employer owes to third persons;

    c.  Failing to ensure that employees and/or agents were properly trained;

    d.  Failing to supervise such employees and/or agents;

    e.  Failing to properly vet employees;

    f.  Failing to supervise such employees; and

    g.  In other respects to be found during the course of discovery.

137.     During the time of A.R.'s placement at Desert Hills, Defendants became aware, or should have become aware, of problems and/or conduct that indicated unfitness of such employees and/or agents. Defendants failed to take further action to investigate, discharge, and/or reassign such employee and/or agents and Plaintiff's damages were caused by Defendants' negligent hiring, retention, and/or supervision of such employees and/or agents.

138.     Defendants had a duty to select employees/agents that performed work with due diligence, in a good manner, using competent and experienced employees/agents in accordance with recognized industry practices, and that would comply with all applicable rules and regulations and standards of Defendants concerning safety, security, and well-being of persons and property. Defendants breached this duty in selecting employees/agents who were unfit.

139.     Defendants retained employees/agents who were incompetent and failed to conduct work in accordance with industry practices and that would comply with all applicable rules, regulations, and standards of Defendants concerning the safety, security, and well-being of persons and/or property.

140.     Defendants knew, or should have known, that the employees/agents were incompetent and failed to work in accordance with industry practices, and that they would not comply with all applicable rules and regulations and standards of Defendants concerning safety, security, and well-being of persons and/or property. Additionally, Defendants failed to supervise the conduct and/or work being performed by employees/agents who were incompetent and failed to conduct work in accordance with recognized industry practice.

141.     Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

142.    A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

143.    Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for it with regard to the conduct at issue, independent of higher authority.

144.    Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

145.    Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

**Liability for Nondelegable Duty**

146.    Due to the nature of the relationship and obligations entered into by Defendants as a result of the contracts involved in this case, including, but not limited to, YFCS's role as custodian for A.R., Defendants had a nondelegable duty for which they cannot escape liability.

147.    The duties created by the relationship between Defendants and A.R. were nondelegable.

148.    As a result of the nondelegable nature of Defendants' duties in this case, they are jointly and severally liable for damages caused to A.R. To the extent Defendants seeks to hold any other entity liable for A.R.'s damages and injuries, Defendants are jointly and severally liable for both the liability of those entities and of any other persons or entities to which their nondelegable duties apply.

## V. COUNT III
## Professional Liability
## (YFCS and Acadia)

149.    The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

150.    In the operation of Desert Hills, and in the care of treatment children like A.R., Defendants owed a professional duty to provide appropriate supervision of children in a treatment facility.

151.    Defendants owed a professional duty to engage in sufficient background investigation and inquiry so as to develop an understanding of the risks and dangers presented for each child whom they agreed to provide care for, including A.R.

152.    Defendants knew, or should have known, that it was foreseeable that children like A.R. are vulnerable and at serious risk of injury and harm if the adults to whom they are entrusted are not safe and regularly supervised.

153.    Defendants breached their professional duty by failing to take adequate steps to protect A.R. when:

a.    They failed to provide adequate supervision over A.R.;

b.    They failed to keep A.R. safe;

c.    They failed to supervise Defendant Lynn;

21

d.  They failed to address the concerns raised by other children at Desert Hills; and

e.  In other ways to be discovered.

154.    As a direct and proximate cause of Defendants' actions and/or omissions, A.R. suffered physical bodily injury and damages.

155.    Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

156.    A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by their employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

157.    Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

158.    Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

159. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## VI. COUNT IV
### Breach of Fiduciary Duty
### (YFCS and Acadia)

160. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

161. At all times material to the allegations set forth in this lawsuit, Defendants knew A.R. was vulnerable to injury and in need of treatment services.

162. Defendants knew that A.R. would suffer injury and harm if he was not properly supervised and protected.

163. Defendants assumed duties as A.R.'s fiduciary, caretaker, and custodian when he was placed in Desert Hills.

164. Defendants breached their fiduciary duty to A.R.

165. As a direct and proximate result of Defendants' breach of duty, A.R. suffered physical bodily injury and damages.

166. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

167. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by their employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their

employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

168.     Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

169.     Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

170.     Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

### VII. COUNT V
### Unfair Practices Act ("UPA") Claims
### (YFCS, Acadia, and Acadia Management)

171.     The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

172.     Defendants have violated the New Mexico Unfair Practices Act, N.M.S.A. 1978, Sections 57-12-1, *et seq.*

173.    Specifically, Defendants are a "person" as defined by Section 57-12-2(A) and has engaged in "trade or commerce" by "offering for sale or distribution . . . services . . . ." as defined in Section 57-12-2(C).

174.    Defendants made representations on their online website regarding their services.

175.    Such statements include, but are not limited to, that Desert Hills "specialize[s] in offering fully comprehensive residential programming that encompasses a full continuum of care."

176.    In providing such services to A.R., Defendants engaged in unfair or deceptive trade practices as defined by Section 57-12-2(D) by knowingly making false or misleading oral or written statements in connection with the sale of services, which did tend to, or did, deceive and mislead A.R.

177.    The conduct of Defendants

    a.    used exaggeration, innuendo, or ambiguity as to a material fact or failed to state a material fact if doing so deceives or tends to deceive; or

    b.    failing to deliver the services contracted for.

178.    Further, Defendants engaged in unconscionable trade practices, as that term is defined in Section 57-12-2(E), because it took advantage of the lack of knowledge, ability, experience, and capacity of A.R. to an unfair degree, rendering Defendants' acts unconscionable trade practices.

179.    As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable trade practices as described above, Desert Hills was selected as the therapeutic program for A.R.

180.    Under Section 57-12-10, Plaintiff is entitled to an award up to three (3) times the actual damages, should they so elect, as opposed to punitive damages under this count, which are also available under the facts and circumstances. Plaintiff is also entitled to an award of reasonable attorney's fees in connection with prosecution of the UPA claims.

181.    The UPA violations were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

182. Plaintiff may elect punitive damages in lieu of treble damages under the UPA.

183. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

184. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

185. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

186. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## VIII. COUNT VI
### Assault and Battery and Infliction of Extreme Emotional Distress
### (All Defendants)

187.    The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

**Assault and Battery**

188.    The repeated rapes and sexual assaults of A.R. by Defendant Lynn constitute assault and battery.

189.    Defendant Lynn committed assault and battery on A.R.

190.    Defendant Lynn committed acts that inflicted harm on A.R., specifically repeated rapes and sexual assaults.

191.    A.R. was harmed as a result of Defendant Lynn's conduct.

192.    YFCS, Acadia, and Acadia Management are vicariously liable for the conduct of Defendant Lynn.

193.    Defendant Lynn was given, and exercised, significant authority and control over A.R., a vulnerable child placed in Desert Hills.

194.    Defendant Lynn was aided by her agency with Desert Hills and Acadia in the commission of the harms perpetrated against A.R.

195.    As a result of Defendant Lynn's repeated sexual assaults and rapes, A.R. suffered severe physical, emotional, and mental injuries and harm.

196.    Further, Defendants acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

197.    A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The

actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

198.    Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

199.    Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

200.    Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

**Infliction of Extreme Emotional Distress Against Defendants**

201.    Defendant Lynn's conduct was extreme and outrageous under the circumstances.

202.    Defendant Lynn acted intentionally and/or recklessly.

203.    As a result of Defendant Lynn's conduct, A.R. has suffered severe emotional distress.

204.    YFCS, Acadia, and Acadia Management are vicariously liable for the conduct of Defendant Lynn.

205.    Defendant Lynn was given and exercised significant authority and control over A.R., a vulnerable child placed in Desert Hills.

206.    Defendant Lynn was aided by her agency with Desert Hills and Acadia in the commission of the harms perpetrated against A.R.

207.    As a result of Defendant Lynn's repeated sexual assaults and rapes, A.R. suffered severe physical, emotional, and mental injuries and harm.

208.    Further, Defendants acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of A.R., resulting in injuries and harm to A.R., justifying an award of punitive damages.

209.    A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of A.R.

210.    Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

211.    Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful

consequences, including the health, safety, and well-being of A.R., and other persons, resulting in the harm and injuries suffered by A.R.

212.    Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principals. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## IX. DAMAGES

213.    The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

214.    As a direct and proximate result of Defendants' conduct, A.R. suffered compensatory damages, including, but not limited to: medical and psychological bills; emotional pain and suffering; physical pain and suffering; loss of enjoyment of life; lost future earning capacity, economic damages, all of which will continue in the future. Additionally, A.R. is entitled to recover punitive damages in such amounts allowed by law and as determined by the factfinders in this case, as well as any other damages or relief available under New Mexico law as determined appropriate by the Court.

## X. JURY DEMAND

215.    Plaintiff hereby requests and demands a trial by jury on all issues properly submitted to a jury.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendants for damages sufficient to fully compensate A.R. for all the injuries and damages described herein, punitive damages, for pre- and post-judgment interest as allowed by law, for costs and for such other and further relief as the Court deems just and proper in law and in equity, including reasonable costs and attorneys' fees incurred in bringing this action.

Respectfully submitted,

FADDUOL, CLUFF, HARDY & CONAWAY, P.C.

*/s/ Carlos E. Sedillo*
Carlos E. Sedillo
Isaac J. Lopez
3301 San Mateo Boulevard NE
Albuquerque, New Mexico 87107
Telephone: 505.243.6045
Fax: 505.243.6642
csedillo@fchclaw.com
ilopez@fchclaw.com

Meghan L. Mitchell
1115 Broadway
Lubbock, Texas 79401
Telephone: 806.763.9377
Fax: 806.763.9378
mmitchell@fchclaw.com

*ATTORNEYS FOR PLAINTIFF*